IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL ACTION NO. 04-36J |
| VINCENT D. DAVIS, a/k/a "The Wizard," | ) | |
| KEVIN P. FLOOD, | ) | |
| KENNETH S. HAMLIN, | ) | |
| RAYMOND A. RABREAU, a/k/a "J.P.," | ) | JUDGE GIBSON |
| and WAYNE A. VANCE, | ) | |
| | ) | |
| Defendants. | ) | |

# **MEMORANDUM OPINION and ORDER OF COURT**

**GIBSON, J.**

This case comes before the Court on several pre-trial motions filed by three of the Defendants in this matter. The Court will review each of these in turn, concluding with the various motions to suppress evidence.

## MOTION OF WAYNE A. VANCE

### Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 72)

Wayne A. Vance (hereinafter "Vance") has moved for the production of any Government evidence for which it would seek admission under Federal Rules of Evidence 404(b) and 609. The Government has responded, but not listed any convictions to be admitted under Rule 609. In regard to other bad acts sought to be admitted under Rule 404(b), the Government has revealed an intention to seek admission of the fact that Vance "visited Mr. [Kevin P.] Flood [hereinafter "Flood"] on previous

occasions for the purpose of obtaining multi-pound quantities of marijuana from [] Flood. This evidence establishes [] Vance's intent, plan and knowledge and rebuts any suggestion of mistake or innocent association." Government's Omnibus Response, p. 39. The Government and the Defendant request that the Court rule on the admissibility of such evidence outside the hearing of the jury, but at differing times: at the time of trial, as requested by the Government or at a pre-trial hearing, at the request of the Defendant. Consistent with the Court's practice, the Court will defer ruling on this matter until the time of trial when the Government seeks to admit such evidence. Since the Government has provided notice of its evidence sought to be introduced under Federal Rules of Evidence 404(b) and 609, Vance's motion requesting such production is granted.

**MOTIONS OF RAYMOND A. RABREAU**

### Motion in Limine with Citation of Authority (Document No. 59)

Raymond A. Rabreau (hereinafter "Rabreau") moves for the exclusion from trial of his prior sentences dated 1971, 1978, 1982, and 1989. In response, the Government has indicated an intention to seek admission of a 1988 conviction for marijuana smuggling and a 2002 conviction for "importation of marijuana/continuing criminal enterprise." It appears that the 1988 conviction mentioned by the Government and the 1989 "sentence" mentioned by Rabreau might be the same offense, but the Court is without further information as to these two representations. The Court will assume that the 1988 conviction and 1989 sentence refer to the same offense and will refer to it as the 1988 conviction while analyzing its admission along with the 2002 conviction in the following section. As for the sentences from 1971, 1978 and 1982, the Government does not indicate that it seeks their admission under Federal Rule of Evidence 609(a)(1) and therefore, the Court will grant Rabreau's motion *in limine* as to these

2

three sentences and will also grant Rabreau's motion *in limine* as to the 1988 conviction as analyzed in the following section.

### Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 60)

Rabreau has moved for the production of any Government evidence for which it would seek admission under Federal Rules of Evidence 404(b) and 609. The Government responded by indicating that it would seek to impeach the Defendant with two criminal convictions if he testified at trial: "a 1988 conviction for marijuana smuggling, and a 2002 conviction for importation of marijuana/continuing criminal enterprise." Government's Omnibus Response, p. 2. The Government also seeks to introduce evidence that Rabreau was on probation in the United States District Court, District of Oregon at the time of the alleged offense and did not request permission from his probation officer to travel to Blair County, Pennsylvania. The Government seeks to prove that Rabreau was aware of this condition of his probation as he had previously requested permission to travel outside that district and that his failure to request such permission is "indicative of the criminal nature of the trip" thus demonstrating an intent to violate the law. Government's Omnibus Response, pp. 5-6. The Government has also provided notice of its intent to introduce Rabreau's 1988 and 2002 convictions for marijuana smuggling and importation of marijuana pursuant to Rule 404(b). Government's Omnibus Response, p. 7. The Government argues that these convictions would be used to demonstrate criminal intent, knowledge of marijuana smuggling and distribution, or discredit claims of "mistake, lack of knowledge, or innocent association." Government's Omnibus Response, p. 9. The Government and the Defendant request that the Court rule on the admissibility of such evidence outside the hearing

3

of the jury, but at differing times: at the time of trial, as requested by the Government or at a pre-trial hearing, at the request of the Defendant. Consistent with the Court's practice, the Court will defer ruling on this Rule 404(b) matter until the time of trial when the Government seeks to admit such evidence.

As to the notice of convictions to be used against Rabreau under Rule 609, the Government also seeks to admit the 1988 and 2002 convictions in order to impeach the Defendant should he choose to testify. The record before the Court does not demonstrate whether the 1988 conviction of Rabreau resulted in his incarceration and subsequent release within the past ten years so as to comply with the ten year time limit found in Rule 609(b). Clearly, the sole fact that Rabreau was convicted in 1988, will not suffice to comply with Rule 609(b). Therefore, the Court finds that the Government will not be permitted to utilize evidence of the 1988 conviction at trial unless the Government produces evidence that that conviction meets to requirements of Federal Rule of Evidence 609(b).

With regard to the 2002 conviction, the Court partakes in a balancing test under Federal Rule of Evidence 609(a)(1). Rule 609(a)(1) permits the impeachment of a criminal defendant through admitting evidence of his prior convictions if "the probative value of admitting this evidence outweighs its prejudicial effect to the accused." In the case of *Government of Virgin Islands v. Bedford*, 671 F.2d 758, 761 (3d Cir. 1982), it was recognized that the Government bears the burden to demonstrate that the probative value outweighs the prejudicial effect. In determining if this has been accomplished, the courts have looked to the four non-exclusive factors of "(1) the kind of crime involved; (2) when the conviction occurred; (3) the importance of the witness' testimony to the case; (4) the importance of the credibility of the defendant." *Id.* at n.4. The District Court for the Eastern District of Pennsylvania

4

recognized five non-exclusive factors in its Rule 609 (a)(1) analysis in the case of *United States v. Paige,* 464 F.Supp. 99, 100 (E.D.Pa. 1978) some of which were cited in *Bedford:* "1) the impeachment value of the prior crime; 2) the point in time of the conviction and the witness's subsequent history; 3) the similarity between the past crime and the charged crime; 4) the importance of the defendant's testimony; and 5) the centrality of the credibility issue." For the sake of completeness, the Court will examine all of these factors in its balancing analysis, including those that are repetitive or are overlapping.

First, in considering the factor of the kind of conviction and the impeachment value of the conviction, the Court agrees with the Government that prior convictions for drug trafficking and distribution bear on the Defendant's veracity to a certain extent, particularly in light of the nature of such crimes and how the person committing them may act in furtherance of such crimes by lying to maintain secrecy. *See U.S. v. Ortiz,* 553 F.2d 782, 784 (2d Cir. 1977). This factor weighs in favor of admission. This prior conviction is also relatively recent, occurring in 2002 and two years prior to the conduct alleged in the indictment and therefore, it is very timely and somewhat probative of Rabreau's veracity and there is very little time between the charged crimes and the previous conviction which demonstrates the conviction is deserving of probative value. This factor weighs in favor of admission. The conviction and the alleged crimes are similar as they deal with distribution of marijuana in the form of conspiracy or a criminal enterprise and this fact favors the conviction's exclusion because of the potential prejudice which would result from the jury concluding that Rabreau would act in conformity with his prior conviction. Rabreau's testimony will most certainly be important in this matter as it concerns five co-defendants in an alleged conspiracy that will most likely result in the various

Defendants placing blame on each other and therefore, this factor favors exclusion of the conviction. As Rabreau will most likely be testifying against Government witnesses and his co-conspirators, his credibility will be central to the jury's deliberations and thus, this factor favors admissibility.

Weighing all of these factors, the Court concludes that Rabreau's 2002 conviction is admissible for purposes of impeachment under Federal Rule of Evidence 609(a)(1) should Rabreau choose to testify at trial. The Court reaches this conclusion as the 2002 conviction bears on the Defendant's veracity, it is probative of this issue because it is a relatively recent conviction with such a conviction being able to illuminate for the jury the issue as to Rabreau's credibility, and the Court can instruct the jury that the purpose of the introduction of the conviction bears upon the veracity of Rabreau's testimony and is not introduced for the purpose of demonstrating that he committed the crimes alleged in the indictment based upon the fact of a prior conviction.

### Motion to Change Counsel/Motion for Reconsideration Based on New Facts and Issues (Document No. 120)

Rabreau has filed a Motion to Change Counsel/Motion for Reconsideration Based on New Facts and Issues (Document No. 120). The Court denies this motion. The Court agrees with the Government that Rabreau seeks a change of counsel based on a disagreement between Rabreau and Attorney Heiple on the strategy employed by Attorney Heiple in the present pre-trial proceedings and which motions to file in support of Rabreau's suggested strategy.

Rabreau produces letters he has written to Attorney Heiple, this Court and others, all of which pre-date his previous Motion to Change Counsel (Document No. 77). The Court has read them, and notes that within them Rabreau suggests certain action be taken by Attorney Heiple in his defense.

6

Nevertheless, the Court agrees with the Government that indigent defendants, like Rabreau, are entitled

to adequate and effective representation, but not counsel of their choice:

> It is axiomatic that an indigent defendant has the right to appointed counsel and to be
> informed of that right. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9
> L.Ed.2d 799 (1963); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694
> (1966). The right of an accused to effective assistance of counsel, however, does not
> extend to the appointment of counsel of choice, or to special rapport, confidence, or
> even a meaningful relationship with appointed counsel. *Morris v. Slappy*, 461 U.S. 1,
> 13-14, 103 S.Ct. 1610, 1617-1618, 75 L.Ed.2d 610 (1983); *Siers v. Ryan*, 773 F.2d 37,
> 44 (3d Cir. 1985)(citing *Davis v. Stamler*, 650 F.2d 477, 479-480 (3d Cir. 1981)), *cert.
> denied*, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989). There is no right to
> counsel who will blindly follow the defendant's instructions. *United States v. Dawes*,
> 874 F.2d 746, 748 (10th Cir. 1989) *reh'g denied, cert denied*, 493 U.S. 920, 110 S.Ct.
> 284, 107 L.Ed.2d 264 (1989), *coram nobis granted on other grounds*, 895 F.2d 1581,
> (10th Cir. 1990). Moreover, a defendant may not manipulate the right to counsel, or the
> right to self-representation, in order to delay or disrupt a trial. *Berry v. Lockhart*, 873
> F.2d 1168, 1171 (8th Cir. 1989); *United States v. Flewitt*, 874 F.2d 669, 674 (9th Cir.
> 1989); *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988), *cert. denied*, 487 U.S.
> 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *United States v. Thier*, 801 F.2d 1463,
> 1471 (5th Cir. 1986), *modified on denial of reh'g*, 809 F.2d 249 (1987). In a slightly
> different context, the Supreme Court noted, "the right of self-representation is not a
> license to abuse the dignity of the courtroom." *Faretta v. California*, 422 U.S. 806, 834,
> 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581 n. 46 (1975)(referring more specifically to a
> disruptive or obstructionist defendant).

*United States v. Jennings*, 855 F.Supp. 1427, 1441 (M.D.Pa. 1994).

The Court notes that the Court of Appeals for the Third Circuit has not formulated a format for

evaluating a *pro se* motion to change counsel made by indigent defendants. In looking for guidance

to evaluate the present motion, the Court will consider the three factors found in *United States v.*

*Calderon*, 127 F.3d 1314, 1343 (11th Cir. 1997) *modified on other grounds by U.S. v. Toler*, 144 F.3d

1423, 1427 (11th Cir. 1998) and *United States v. Brown*, 79 F.3d 1499, 1505 (7th Cir. 1996) as set forth

in the Government's brief: "1) the timeliness of the motion; 2) the adequacy of the court's inquiry into

7

the motion; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and his counsel thereby preventing an adequate defense." First, Rabreau filed a timely motion with his first motion to change counsel and the present motion expands on the issues considered by the Court in that motion; in essence Rabreau is requesting a re-consideration of the Court's denial of his previous motion. The Court finds this request for reconsideration untimely as it was filed approximately five months after the Court's decision on Rabreau's first Motion to Change Counsel.

Second, the Court has reviewed Rabreau's motion and his exhibits attached thereto which he considers his "new" evidence in support of his motion. The Court finds that there is no need for a hearing on this issue based upon its determination that there is ample evidence upon which to decide Rabreau's motion in that such evidence is in hand, together with a review of the docket and filings made by Attorney Heiple.

A review of this evidence reveals that Rabreau requested that Attorney Heiple take certain actions and make certain motions which were not done, including hiring an investigator and motioning for discovery. The record also reveals that Attorney Heiple filed three pre-trial motions on behalf of Rabreau, a motion in limine, a motion under Rules of Evidence 404(b) and 609, and a motion to join the co-defendants' motions. The latter motion was granted and resulted in the analysis below, but Rabreau has been found to be without any basis to assert a Fourth Amendment right while within the Flood residence. This decision is not a result of any ineffectiveness or tactical decisions made by Attorney Heiple, but a result of the evidence presented to and credited by the Court.

As for the third consideration, whether the conflict at issue results in total lack of

8

communication between Attorney Heiple and Rabreau, the Court sees no complete failure to communicate, but only a disagreement as to the manner of proceeding with Rabreau's defense. Furthermore, such disagreement has not prevented an adequate defense thus far in the proceedings. Attorney Heiple has explored certain issues through motions, including suppression of Rabreau's statements. The Court has ruled against Rabreau because of his lack of "standing" under the Fourth Amendment; the Court reiterates that this is not the result of ineffectiveness on Attorney Heiple's part, but the circumstances under which the Defendant has come before this Court, making it difficult for Attorney Heiple to establish a defense of Rabreau's alleged actions by means of suppression.

Rabreau's claim of "irreconcilable conflict" may appear to him as the cause of what he perceives as ineffective assistance of counsel, however, such a claim has not been found to be a "justifiable dissatisfaction" with one's counsel. *See U.S. v. Barrow*, 287 F.3d 733, 738 (8th Cir. 2002). In fact, the Eighth Circuit has found that "[justifiable dissatisfaction] does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation." *Id.* Such is the argument of Rabreau in the case *sub judice* and this Court agrees with the reasoning of the Eighth Circuit. Therefore, considering the foregoing analysis, the Court denies Rabreau's motion.

Rabreau in his Supplyment [sic] Addition to Facts (New) and Issues Pertaining to Motion to Change Counsel/for Reconsideration (Document No. 138), adds to the argument already submitted by his court-appointed attorney, Attorney Heiple, as well as attempts to add facts that he wishes the Court to consider in evaluating the pre-trial motions before the Court, that were resolved through the analyses above. Clearly, the record before the Court on the various issues of suppression was closed, except for

9

the addition of the exact date of the affidavits in support of the search warrant found at Government Exhibit 15, at the conclusion of the suppression hearing on November 30, 2005. TVIV,[1] pp. 77-78. No further evidence, save the information regarding the unsealing of the affidavits, was permitted to be submitted for evaluation by the court for the present suppression issues. Furthermore, Rabreau produces no documentation or evidence in support of his newly proffered facts. As for any argument made by Rabreau regarding any of his pending motions, such argument is ignored by the Court as Rabreau is a represented party to this criminal action and the Court agrees with the Government that hybrid representation, that is simultaneous representation by an attorney for a party and by that party *pro se*, is not permitted. *See United States v. Daniels,* 572 F.2d 535, 540 (5th Cir. 1978); *see also United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981); *Hall v. Dorsey*, 534 F. Supp. 507, 508 (E.D.Pa. 1982). Thus to the extent that the Supplement at Document No. 138 is considered a motion, it is denied; to the extent it is a true supplement to Rabreau's *pro se* Motion to Change Counsel (Document No.120), it is denied for the reasons set forth above.

## MOTIONS OF KEVIN P. FLOOD

### Motion to Quash Indictment (Document No. 71)

Flood moves to quash the indictment filed against him based upon the argument that the Pennsylvania State Police had the CI Brubaker plant "drug paraphernalia" in his residence and that CI Brubaker also "fed Oxycontin and other controlled substances to [Flood] to alleviate [Flood's] back pains" and that the law enforcement officers investigating Flood were aware of this and took advantage

---

[1]Transcript of Suppression Hearing, Volume IV(Document No. 131).

of this fact so as to facilitate the placement of several hundred pounds of marijuana in Flood's residence. Motion to Quash, ¶¶ 34-38.

Although characterized as a Motion to Quash Indictment without any supporting citation to law other than a passing mention of a violation of Flood's rights, Flood's motion appears to be a Fifth Amendment due process challenge to the indictment pursuant to a "claim that the government employed outrageous law enforcement investigative techniques." *U.S. v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998). Although such a claim may meet this standard, the Court will not grant an evidentiary hearing on this matter as a defendant's conclusory allegations are not sufficient to warrant an evidentiary hearing regarding such allegations. *U.S. v. Agnes*, 581 F.Supp. 462, 478 (E.D.Pa. 1984)(citing *U.S. v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972)). Without Defendant Flood providing any basis for his allegations in the motion, the Court will not schedule an evidentiary hearing for him regarding this matter, the Court denies Flood's Motion to Quash Indictment.

### Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 87)

#### F.R.E. 609

The Government seeks to admit evidence of Flood's three convictions in 1992 for "trafficking in Drug/Attempt 2nd Degree," "Distribution/delivery marijuana," and "Distribution/delivery/manufacturing a controlled substance" against him if he testifies under Federal Rule of Evidence 609(a)(1). Government's Response (Document No. 92), pp. 1-2. Rule 609(a)(1) permits the impeachment of a criminal defendant through the admission of evidence of his prior convictions if "the probative value of admitting this evidence outweighs its prejudicial effect to the

11

accused." In the case of *Government of Virgin Islands v. Bedford*, 671 F.2d 758, 761 (3d Cir. 1982),

it was recognized that the Government bears the burden to demonstrate that the probative value

outweighs the prejudicial effect. In determining if this has been accomplished, courts have looked to

the four non-exclusive factors of "(1) the kind of crime involved; (2) when the conviction occurred;

(3) the importance of the witness' testimony to the case; (4) the importance of the credibility of the

defendant." *Bedford* at 761, n. 4. The District Court for the Eastern District of Pennsylvania recognized

five non-exclusive factors in its Rule 609 (a)(1) analysis in the case of *United States v. Paige*, 464

F.Supp. 99, 100 (E.D.Pa. 1978) some of which were also cited in *Bedford*: "1) the impeachment value

of the prior crime; 2) the point in time of the conviction and the witness's subsequent history; 3) the

similarity between the past crime and the charged crime; 4) the importance of the defendant's

testimony; and 5) the centrality of the credibility issue." For the sake of completeness, the Court will

examine all of these factors in its balancing analysis, including those that are repetitive or are

overlapping between *Bedford* and *Paige*.

 First, in considering the factor of the impeachment value of the prior crime, the Court agrees

with the Government that the prior crimes of drug trafficking and distribution bear on the Defendant's

veracity to a certain extent, particularly in light of the nature of such crimes and how the person

committing them may act in furtherance of such crimes by lying to maintain secrecy. *See U.S. v. Ortiz*,

553 F.2d 782, 784 (2d Cir. 1977). This factor weighs in favor of admission. However, the type of

crime involved concerns the same activity, drug distribution, which presents potential for the fact that

the jury may view the Defendant's past crimes as evidence that he possesses a potentiality to have

committed the crimes charged in the indictment. Therefore, this factor also weighs against

admissibility. The convictions for the past crimes occurred in 1992, but, according to the Government, Flood was sentenced to ten years for those crimes which, if true, would place his release date at approximately 2002. Flood's convictions would certainly be admissible under the time limit of Rule 609(b), but their probative value decreases with their age, as such convictions are fourteen years old. Thus, the convictions bear some probative value but less than that of a recent conviction as found in Rabreau's Rule 609 motion. Flood's testimony will certainly be critical in the trial of this matter as it concerns  five co-defendants in an alleged conspiracy which will most likely result in the charged Defendants directing blame toward each other and not necessarily the Government. With the potential that the Defendants will testify against each other, Flood's testimony will most likely be necessary to present his defense and the availability to present his case through another witness would be difficult at best. Therefore, this issue weighs in favor of exclusion of the convictions. When testifying, Flood's credibility will most certainly be at issue when the jury must deliberate to decide the facts of this alleged conspiracy and therefore, this factor favors admission. This is so because in order to evaluate such credibility, Flood may present himself as a person without knowledge of the "drug trade" as it were and attempt to paint himself as never having known people within this illicit trade or being without knowledge that he was acquainted with such people. The prior convictions would present a full picture of Flood's life and experiences that would enlighten the jury as to his capacity to know or do things only known within the "drug trade."

Balancing all of these factors, the Court will conditionally exclude for the purpose of impeachment the evidence of Flood's convictions from 1992 concerning the distribution of illegal drugs as their probative value does not outweigh their prejudicial effect. However, should Flood testify on

13

direct examination or re-direct examination that he is without knowledge of the workings of "drug trade" or that he has never been arrested *previously* or convicted of a drug-related criminal offense, the Government will be permitted to question Flood regarding his previous convictions. Flood will be permitted to testify to the effect that he was not a member of the conspiracy as presently charged and/or that he did not commit the crimes as charged in the indictment-such statements may be impeached through a previous confession in this matter, but *will not* "open the door" to his previous convictions and the Government is advised that questioning Flood regarding past convictions will not be permitted if he denies the allegations within the present indictment.

At trial, the Government seeks to introduce evidence of the 1992 convictions pursuant to F.R.E. 404(b) for the purposes of intent, knowledge, plan, absence of mistake, and will also seek to introduce evidence that Flood and all of the other co-defendants "had been involved in the importation and distribution of marijuana for a period of time preceding the date of the arrest in this case. This will establish a prior association between the co-defendants, and will be used to prove intent, knowledge, plan, preparation and absence of mistake." Government's Response, pp. 5-6. The Government argues that the evidence of the Defendant's involvement in distribution of marijuana prior to the date is intrinsic to the crimes charged and need not satisfy Rule 404(b) to be admitted. So as to allow the Defendant to respond to this argument as well as to understand the proffered evidence in context, the Court will defer ruling upon the admissibility of the proffered Rule 404(b) evidence until the time of trial.

14

**SUPPRESSION MOTIONS**

**Flood's Motion to Suppress, Motion to Suppress Statement and Motion to Suppress Audio-Tape Surveillance (Document No. 71); Vance's Motion to Suppress (Document No. 73) and Supplemental Motion to Suppress Evidence and Defendant's Statements (Document No. 123)[2]**

FINDINGS OF FACT[3]

BACKGROUND

Pennsylvania State Police Trooper Charles Schaefer (hereinafter "Trooper Schaefer") was the case agent for this criminal matter, that is the law enforcement officer coordinating the investigation of the matters alleged in the indictment. T, pp. 6-7.

Keith Brubaker (hereinafter "Brubaker") is the confidential informant in this matter; he was instructed by Trooper Schaefer not to illegally use or distribute any controlled substances during the time he was working as a confidential informant in this matter and Brubaker signed a form indicating his acknowledgment of this requirement. T. pp. 33, 148-149; TVIV, p. 10.

Brubaker purchased OxyContin tablets from Kenneth Hamlin (hereinafter "Hamlin")from March 2, 2004 until April 11, 2004 that were not from his prescriptions, but he did not tell the police of this; Brubaker was using prescription drugs during this time frame that were prescribed to him, *i.e.*, OxyContin. TVIV, pp. 27-29, 49, 53.

While working as a confidential informant, Brubaker would take more than his prescribed

---

[2]Rabreau joins in these motions by way of the Court's order (w/ Document No. 69) granting his Motion to Join in Co-Defendants' Motion (Document No. 58) and Flood also joins Vance's Supplemental Motion by way of the Court's order (Document No. 128) granting his Motion to Join (Document No. 126).

[3]For purposes of the facts herein, citation to four volumes of transcripts of the testimony taken at the suppression hearing will be referred to as "T" (Document No. 101), "TVII" (Document No., 102), "TVIII" (Document No. 114), "TVIV" (Document No. 131) respectively.

medication, but did not tell the police this fact; he did not take more than his prescribed medication when meeting with Flood. TVIV, pp. 50-51.

Brubaker illegally supplied Flood with OxyContin for Flood's back pain from March 2, 2004 until April 11, 2004 and Flood continued to take this and possibly other illegal substances provided by Brubaker to combat his back pain while still seeking chiropractic care. TVII, pp. 237-239, 250-260.

Prior to becoming the confidential informant, Brubaker was found to be in possession of approximately 45 to 50 pounds of marijuana at his home, which was part of a larger shipment of marijuana that arrived from California prior to March 2, 2004 and said shipment was originally at Flood's residence. TVIV, pp. 10-11, 54.

After the completion of the search of his home, Brubaker was also found to be in possession of a bag of cocaine that was kept for Flood. TVIV, p. 49.

Hamlin and Flood also received a part of this March 2nd shipment of marijuana; Brubaker would sell his portion of the marijuana and he also stored a portion of the shipment for Flood. TVIV, pp. 11-12.

Brubaker owed Flood money for the March 2nd shipment of marijuana found at his home. TVIV, pp. 21-23.

U.S. currency was found at Brubaker's home and was seized with approximately $20,000 to $25,000 intended to be given to Flood; the Pennsylvania State Police gave amounts of $20,000 and $7,000 to Brubaker to give to Flood, but it is unknown whether these monies were the same monies seized from Brubaker's home. TVIV, pp. 23-24.

These two amounts of currency were used to purchase more marijuana and the $20,000 was

16

given to Flood and the $7,000 was given to Rabreau, but Brubaker cannot recall the specific instance of giving Flood the money. TVIV, pp. 24-25, 52, 62-63, 64.

A weight scale and money counter were also given back to Brubaker by the police after a search of his house and they were thereafter taken to Flood's residence. TVIV, pp. 36, 48, 58, 65.

Trooper Schaefer was certified in the use of a body recorder, specifically a small tape recorder that did not transmit the recorded conversation to law enforcement while it was occurring, and this recorder was placed on Brubaker and a tape recording was made of conversations between him and the Defendants. T, pp. 7-8, 118.

From March 2, 2004 until April 11, 2004, Brubaker had on occasion carried a recording device during his contact with Flood, but he did not carry the recording device during every contact with Flood; Brubaker would contact the police after most contacts with Flood, but would not contact the police after "just normal everyday activity." TVIV, pp. 25-26.

Brubaker agreed to have his conversations recorded and Trooper Schaefer also obtained permission from the District Attorney of Blair County, Pennsylvania to possess the electronic surveillance equipment in question and obtained a state court order permitting reception of communications within a residence. T, pp. 8-9, 10-13.

The tape-recorded conversations were listened to by Trooper Schaefer immediately after they were completed. T, pp. 118-119.

Brubaker did not take his recording device each time he went to the Flood residence and he went to the residence without telling Trooper Schaefer beforehand, but did at times communicate to Trooper Schaefer afterward that he had been in the Flood residence although it is unknown if he did this after

17

every visit. T, pp. 130-131.

Between March 2, 2004 and April 11, 2004, Hamlin gave money to Brubaker, which was intended to be given to Flood to pay for marijuana previously given to Hamlin by Brubaker. TVIV, pp. 37-38.

Vance currently resides in Bedford, Virginia and has known Flood since the year 2000 and had previously stayed overnight at Flood's residence. TVII, pp. 166-167.

On the weekend of April 10-11, 2004, Vance and his "stepdaughter"[4] had stopped to stay at Flood's residence while intending to continue on their way to visit Vance's daughter in Canton, Ohio; Vance was asked by Flood to stop at Flood's residence and fix his white Chevrolet truck before traveling to Canton. TVII, pp. 167-168, 194-195, 245, 263-264.

Vance and his "stepdaughter" arrived at Flood's residence at approximately noon on April 10, 2004. TVII, p. 169.

Brubaker arrived at the Flood residence at approximately 1:30 p.m. on the afternoon of April 10, 2004 and brought with him some "back medicine" in pill form and "some powder in a little bag", offered it to Flood, and Vance entered the dining area where the two men were crushing the pill and told them to "get that ---- out of here!" and Flood and Brubaker proceeded into the garage; Flood later came back in alone and apologized to Vance and said Brubaker was not going to come back until Vance was gone. TVII, pp. 169-171, 195-196; TVIV, pp. 30, 61.

---

[4]Although the juvenile referenced as "stepdaughter" was not Vance's stepdaughter during the events set forth here, it is assumed that this is Vance's current relationship to the juvenile. See pp.26, 27, *supra*. For the ease of reference the term "stepdaughter" is utilized, but is not intended to reflect the status of any legal relationship between the two individuals at the time of these events.

Vance was given the key to Flood's residence and Flood left for his girlfriend's house and thereafter Vance left with his stepdaughter to run some errands, they later returned to the residence and then left again to go to the local mall and see a movie and returned to the residence after the conclusion of the movie. TVII, pp. 171-173, 196, 262-263.

Flood then showed Vance his truck and Vance recognized what was wrong with it and indicated that it required him to come back another time to fix it because it was a problem that required rime to fix; Flood offered to Vance that he spend the night at his residence because of the late hour and Vance accepted the invitation. TVII, pp. 173-175.

Flood and Vance then spent the night drinking from 12:30 a.m. until 2:30 a.m. TVII, p. 175.

Vance woke up to the sound of the Special Emergency Response Team (hereinafter "SERT team") executing the ASW on the morning of April 11, 2004; Vance was placed in flex cuffs and escorted along with his daughter to a police van and then to a police car and waited for approximately forty-five minutes while the police secured a child car seat for Vance's daughter prior to departing for the State Police Barracks. T, p. 36; TVII, pp. 176-178.

Vance requested and was permitted to make a telephone call to his brother who was in Hershey, Pennsylvania that Easter Sunday in order for him to pick up his "stepdaughter" and after leaving a message on his second attempt, Vance was told that Blair County Children and Youth Services (hereinafter "CYS") was contacted. TVII, pp. 179-181, 197, 198.

Trooper Schaefer applied for three anticipatory search warrants (hereinafter "ASW") of Flood's residence, but only one of the warrants, the latest one in time, was executed because it was the only ASW for which all of the "triggering" events occurred. T, pp. 23-39.

The four "triggering" events were as follows: 1) the arrival of the marijuana; 2) Brubaker meeting with Trooper Schaefer at a predetermined location (the parking lot of Sheetz near Flood's residence); 3) Brubaker entering the Flood residence; and 4) Brubaker contacting Trooper Schaefer from within Flood's residence to advise him that he saw the marijuana in the Flood residence. T, pp. 31, 33-37.

Flood was called by Rabreau early in the morning of April 11, 2004 and Flood drove to the parking lot of Wal-Mart, met Rabreau there and escorted him back to his residence. TVII, pp. 282-283.

On the morning of April 11, 2004, Flood called Brubaker to tell him that a "shipment of marijuana" had arrived. T, pp. 162-163.

Trooper Schaefer, after conversing with Brubaker via telephone at approximately 6:15 a.m. on April 11, 2004, concluded that the marijuana had arrived; Brubaker was at his own home when he called Trooper Schaefer. T, pp. 33-34, 145, 204-205; TVII, p. 126.

Corporal Zimmerman was aware of Trooper Schaefer's meetings with Brubaker, that Brubaker was using a recording device, and had reviewed Trooper Schaefer's paperwork for the search warrants that were applied for in this matter and accompanied him to Judge Doyle's home to have the ASW signed at 8:00 a.m. on the morning of April 11, 2004. TVII, pp. 133-134, 145-146.

Corporal Zimmerman was looking for a red Chevrolet full size truck with a tool "box in the back" on the morning of April 11, 2004 when he drove to Wal-Mart after the telephone call from Brubaker to Trooper Schaefer in an attempt to locate the "mule" transporting the marijuana to Flood's residence; this suspected vehicle was suspected to belong to Vincent Davis, a/k/a "The Wizard" (hereinafter "Davis"). TVII, pp. 138-139, 148-149.

The ASW was prepared in part prior to April 9, 2004, but was completed on April 10, 2004 and signed by Judge Doyle on the morning of April 11, 2004. T, p. 29; TVII, p. 147; Government Exhibit 15.

The ASW lists a "white Ford F350 with Oregon Reg. WAM650 and white box trailer" because Trooper Schaefer obtained information from Brubaker who viewed that vehicle at the Flood residence prior to April 11, 2004 and made note of its description and license information and that it was Rabreau's trailer and spoke with Flood who indicated that Rabreau was going to be the "mule." TVII, pp. 152-161.

The first page of the search warrant was not modified after the signature of Assistant District Attorney Keating (hereinafter "ADA")reviewed and signed it on April 9, 2004; additional information was added later to other pages of the ASW which was verbally approved by the ADA over the telephone. T, p. 29; TVII, pp. 161-163.

Trooper Schaefer met with Brubaker at approximately 9:45 a.m. in Brubaker's vehicle in the parking lot of Sheetz while Corporal Zimmerman was seated in his own vehicle; Trooper Schaefer and Brubaker devised a code for Brubaker to use when inside of Flood's residence in order to communicate with Trooper Schaefer through a telephone conversation and indicate if the suspected marijuana was present and how many individuals were inside the house. T, pp. 34-36, 53, 116, 174; TVII, pp. 124-125, 139. TVIV, pp. 34-35.

Brubaker entered the Flood residence at approximately 10:05 a.m and at approximately 11:05 a.m. contacted Trooper Schaefer by telephone indicating through the established code that five or six persons were in the residence along with the suspected marijuana; Brubaker subsequently began moving

21

the marijuana upstairs for purposes of weighing and packaging. T, pp. 37-38, 53, 54, 119-120, 164-165, 202-203, 205; Defendant's Exhibit "A"; TVII, pp. 126-127. TVIV, pp. 34-35, 56-58.

On April 11, 2004, Brubaker was not present when the marijuana arrived but did help move the marijuana from the downstairs to the upstairs of the Flood residence; Flood was in the residence when Brubaker arrived. TVIV, p. 33.

Brubaker did not see Rabreau or his traveling companion in the house when he arrived, but only assumed that he was there because he saw his truck with a trailer attached parked outside of the Flood residence. T, pp. 206-207; TVIV, p. 44.

Brubaker first saw Rabreau after the Flood residence was entered into by the SERT Team to execute the ASW. T, p. 207; TVIV, p. 44.

After completion of this telephone call, an ASW was executed by the SERT team and over 500 pounds or marijuana was recovered in one of the bedrooms of the Flood residence while one firearm was recovered in another bedroom where Rabreau was sleeping; among other items recovered were gallon size Ziploc bags and a weight scale. T, pp. 38-40, 135.

Brubaker did not see Vance at Flood's residence until after the police arrived. TVIV, p. 44.

Brubaker never had a key to Flood's residence and was only inside the residence once when Flood was not present, but Rabreau was then present and Brubaker gave Rabreau $7,000 for marijuana that was previously brought into Pennsylvania for Brubaker but not necessarily brought into the state by Rabreau; this occurred at some date between March 2, 2004 and April 11, 2004. TVIV, pp. 13-14, 38, 41-43.

Brubaker met Rabreau before the meeting when he gave him the $7,000. TVIV, pp. 38-39.

22

Brubaker never put any "large quantities of marijuana" in Flood's residence during February or March of 2004. TVIV, p. 15.

Brubaker did not sell heroin during March 2004, but did have Jeff Holmberg selling marijuana for him prior to becoming a confidential informant. TVIV, pp. 15-20.

Corporal Bravis gave Flood the face page of the search warrant after his residence was entered and secured by the SERT team, but Flood at this time was not given the affidavit of probable cause because it was a sealed court document. TVIV, pp. 68-69.

The affidavits supporting the ASW were not presented to any of the occupants of Flood's residence at the time of the search; only the front page and the attachments thereto of the search warrant were supplied, but these documents did not detail the "triggering" events of the ASW. T. pp. 49-50.

The affidavit of probable cause that supported the ASW at issue in the case *sub judice* was unsealed on June 23, 2004, but the date of that it was given to Flood is unknown. Exhibit 1, Vance's Proposed Findings of Fact (Document No. 133); TVIV, pp. 69-70.

Brubaker is represented by Attorney Steven Passarello, who was contacted by Trooper Schaefer prior to the suppression hearing in this Court on the present motions wherein that conversation Trooper Schaefer indicated to Attorney Passarello that Brubaker "better be careful with what he testifies." T, pp. 151, 153.

Attorney Passarello understood Trooper Schaefer's words to be indicating that Brubaker should be careful not to incriminate himself. T, pp. 153-154.

Brubaker has since been granted immunity by the Government. TVIV, pp. 2-4, 9, 58-59.

Attorney Passarello also appeared in court for the purpose of representing Brubaker at the

23

suppression hearing. T, p. 154.

Brubaker was contacted by Marc Caudel, an investigator representing Vance in this matter who inquired as to whether Brubaker made the telephone call to Trooper Schaefer from inside the Flood residence on the morning of April 11, 2004 and Brubaker responded that he did not remember. T, pp. 165-167, 200.

After Brubaker had spoken to Marc Caudel, Trooper Schaefer told Brubaker to not talk to anyone again without consulting Attorney Passarello first. T, pp. 169, 175.

Brubaker indicated to Marc Caudel that he not think he made a phone call from Flood's residence to Trooper Schaefer on the morning of April 11, 2004. T, p. 229.

Brubaker stated during the suppression hearing that he did contact Trooper Schaefer by telephone from inside the Flood residence on the morning of April 11, 2004. T, pp. 164, 200.

All of the occupants of Flood's residence at the time of the execution of the search warrant were interviewed and they included, Rabreau, Flood, Vance, Brubaker, Hamlin, Vance's "stepdaughter" and Karen Sandner, a companion of Rabreau. T, p. 41.

Brubaker was arrested along with all the other persons present in the residence during the execution of the ASW and subsequently made a statement to Trooper Jeffrey Johnson regarding the events of April 11, 2004, but did not include the fact that the "triggering" telephone call was made by him to Trooper Schaefer. T, pp. 58-63.

Brubaker's own written statement does not indicate that he made a telephone call to Trooper Schaefer and he did not tell Trooper Snyder, his interviewer that he made such a telephone call. T, pp. 63-64, 220.

Trooper Schaefer's phone call from Brubaker was not recounted in any of the police reports on this matter. T, pp. 126-127.

After the execution of the ASW, Vance and his five year-old "stepdaughter" were taken out of the Flood residence and placed into a patrol car together and eventually taken to the State Police Barracks; CYS was called and arrived and eventually took custody of Vance's daughter later the same day. T, pp. 65-67.

Vance and his "stepdaughter" were brought back to the State Police Barracks at approximately noon on April 11, 2004. T, p. 70.

Trooper Schaefer did not participate in the interviews of Flood or Rabreau, but did discuss with Vance the possibility of his cooperating with law enforcement, which resulted in Trooper Schaefer ending his conversation with Vance after concluding that he did not appear to be sufficiently trustworthy to cooperate with law enforcement. T, pp. 41-42.

Trooper Schaefer's conversation with Vance was limited to Vance's possible cooperation with law enforcement. T, p. 68.

Trooper Schaefer, while dressed in plain clothes with a sidearm on his hip, spoke in a calm voice with Vance between ten and fifteen minutes, and did not touch Vance, did not advise him of his *Miranda* rights at any time, and did not report the substance of this interview to anyone while Vance did not tell Trooper Schaefer that he did not want to speak with him anymore or that he wanted to speak with an attorney T, pp. 43-45.

Trooper Schaefer only learned on the morning of the execution of the search warrant that the marijuana to be delivered to Flood's house was being held at Wal-Mart while waiting for Flood to

25

escort the "mule" to Flood's residence; thus, the information concerning the Wal-Mart location was not placed in the ASW. T, pp. 46-47.

The Troopers assigned to guard Vance and his "stepdaughter" did not discuss any possible cooperation between Vance and the Government or the Commonwealth of Pennsylvania and did not discuss CYS or their possible involvement in Vance's custody of his "stepdaughter." T, pp. 237-238, 243-245.

Janice Toguchi (hereinafter "Toguchi") is a caseworker for CYS and was working emergency duty on April 11, 2004 when she received a page from the Pennsylvania State Police Barracks in Hollidaysburg; Toguchi responded to the page by telephoning the Barracks and thereafter arriving at the Barracks after 2:00 p.m. to take custody of Vance's "stepdaughter" because she understood that Vance would be detained. TVIII, pp. 17-19.

Toguchi had no substantive discussion with State Police Troopers while at the Barracks and no Troopers were in the room with Toguchi, Vance and his "stepdaughter"; Toguchi only was aware that Vance was in custody because of a "drug bust" through a telephone call to the Barracks prior to arriving to interview Vance. TVIII, pp. 37-39.

During the events of April 10 and 11, 2004, Vance was not Sherry's husband, but only her boyfriend; they eventually did marry one another. TVII, pp. 227-228, 232.

Prior to conducting her interview of Vance, Toguchi had not determined if she needed to take custody of Vance's "stepdaughter." TVIII, pp. 19.

Toguchi recognized Vance's "stepdaughter" as well-groomed and well-behaved. TVIII, pp. 20-21.

After her interview of Vance, Toguchi advised Vance that because there were no relatives residing within Pennsylvania to whom they could release his stepdaughter and that it was suggested to Vance that he either sign a voluntary custody placement agreement or emergency custody would be sought by CYS; Vance signed the voluntary custody agreement. TVIII, pp. 22, 23.

Toguchi requested Vance sign paperwork so that his "stepdaughter" could be released to her mother, Vance's wife, upon her arrival; Vance's "stepdaughter" was thereafter taken into custody by the CYS worker. TVII, pp. 181-182.

Vance was informed that anyone coming to take back custody of his "stepdaughter" would have to be verified as to their identity and their residence reviewed and investigations into this matter completed. TVIII, p. 22.

Toguchi's meeting with Vance concluded approximately at 4:30 p.m. and Toguchi took Vance's "stepdaughter" from the barracks and into her custody at 5:00 p.m. TVIII, p. 25.

Sherry Vance, Vance's wife, was contacted by Vance's brother regarding the status of her daughter and she proceeded to the CYS office in Blair County and after an interview and having produced documentation requested, CYS would not relinquish custody of her daughter to Sherry and a "72 hour hearing" was held, but her daughter was not returned until after eleven months and eleven days. TVII, pp. 223-227.

The next day, Toguchi obtained emergency custody of Vance's "stepdaugther" after speaking to Sherry and learning Vance was not the biological father or legal guardian of the "stepdaughter" at that time, but that he was only the boyfriend to Sherry. TVIII, p. 27.

Toguchi mirandized Vance prior to the interview on April 12, 2004 at the Blair County Prison;

27

Vance clarified that he was not the biological father. TVIII, pp. 27-28.

Toguchi called Corporal Zimmerman regarding the charges against Vance, Toguchi offered statements to Corporal Zimmerman made by the "stepdaughter" regarding the execution of the ASW, her home life, and moving from Ohio to Virginia because her family was "kicked out for making bad stuff." TVIII, pp. 31-33, 43.

Toguchi inquired of Corporal Zimmerman who could be subpoenaed from the State Police to testify at the "reasonable efforts hearing" regarding the arrest of Vance; either Corporal Zimmerman or Trooper Schaefer asked Trooper Carothers to appear at the dependency hearing for Vance's "stepdaughter" and Trooper Carothers was later subpoenaed. TVII, p. 131; TVIII, pp. 34-35.

Trooper Carothers testified on behalf of the Pennsylvania State Police at the "72 hour hearing" regarding Vance's background and that he was asleep when the ASW was executed; Trooper Carothers approached Sherry after the hearing, gave her his business card, apologized in regard to what happened to her daughter, and that if Sherry had any information for him that it would facilitate her daughter being returned to her, but Sherry had no such information. TVII, pp. 226-227.

The exact time of the arraignment of Vance and Flood on April 11, 2004 is unknown, but appears to have been after 9:00 p.m. that evening. TVII, pp. 19-20, 104, 193.

### RABREAU INTERVIEW

Rabreau was transported back to the State Police Barracks after the execution of the ASW by Trooper Richard Swank; Rabreau, without being questioned or prompted, commented to Trooper Swank while being removed from his car and taken into the barracks that a female that was in custody and also being escorted into the Barracks from a separate vehicle did not know anything about the

marijuana found at the Flood residence. T, pp. 251-253.

## VANCE INTERVIEW

Vance was interviewed at 4:30 p.m. by Trooper Richard McEldowney in his office who interviewed him alone, without his "stepdaughter" and mirandized him and asked if he would provide a statement and in response Vance indicated that he would not provide a written statement, but did agree to provide an oral statement. TVII, pp. 5-8, 10, 26, 30-35, Government Exhibit 17.

In light of this response, Trooper McEldowney proceeded to question Vance who in response stated that he was invited by Flood to come to his house for Easter and to bring his child and when he woke up the police were in Flood's house; this interview lasted approximately two minutes. TVII, pp. 8-9.

Prior to Vance's initial oral statement, Trooper McEldowney completed all portions of the form found at Government Exhibit 17, a form used to record a suspect's written statements, with the exception of the initials "WV" which were placed there by Vance. TVII, pp. 7-8, Government Exhibit 17.

Vance      has had previous encounters with police and had been read his *Miranda* rights prior to April 11, 2004. TVII, pp. 184, 197-198.

Vance never requested an attorney during this initial interview, the interview stopped because Trooper McEldowney was satisfied with his answer, and the subject of his "stepdaughter" was never discussed. TVII, pp. 9-10, 28.

After the interview was completed, Vance's daughter was brought into the interview room where Vance was; Vance later indicated that he wanted to contact his brother to come and get his

"stepdaughter." TVII, pp. 10-11, 36-37.

The police never threatened to take Vance's "stepdaughter" from him or use her as a "bargaining chip" to get Vance to make a statement or cooperate and Vance was never handcuffed or in restraints in front of his "stepdaughter." TVII, pp. 11-12, 13, 20.

Corporal Zimmerman made the contact to CYS requesting that they come and take Vance's "stepdaughter" into their custody. TVII, pp. 128-130.

After his "stepdaughter" was taken into CYS custody, Vance later re-initiated contact with Trooper McEldowney and indicated that he had information on individuals he knew of in Michigan if that would help him out and the Trooper indicated that he would have to confer with Trooper Schaefer. TVII, pp. 13, 37-39.

Trooper Schaeffer was contacted and then spoke with Vance without Trooper McEldowney present and concluded that Vance's information was insufficient to consider reducing Vance's charges. TVII, pp. 13-14, 45-46.

Trooper McEldowney later had a third contact with Vance after Trooper Schaefer completed his interview of Vance; Vance indicated he wanted to make a statement and he was reminded by Trooper McEldowney that he was mirandized, and in response he indicated that he still understood his rights and provided a signed, written statement outside of the presence of his "stepdaughter." TVII, pp. 14-15, 40-41.

Subsequently, Trooper McEldowney then tape recorded a statement from Vance with Vance's permission after he was reminded of his *Miranda* rights. TVII, pp. 16-17, 46-54, 55-57.

Vance never asked to speak to an attorney while in the presence of Trooper McEldowney and

30

Trooper McEldowney was not in uniform that day, did not raise his voice to Vance and did not physically touch Vance on April 11, 2004. TVII, p. 21.

### FLOOD INTERVIEW

On April 11, 2004, Flood was brought to the Pennsylvania State Police Barracks from his residence by Trooper David Snyder at 12:00 p.m. and mirandized at 12:10 p.m.; the trooper was directed to conduct this interview by either Trooper Schaefer or Corporals Zimmerman or Bravis. TVII, pp. 63-65, 89-92, 103, 104, 142, 241, 269.

Trooper Snyder was working a surveillance detail of the area around the Flood residence from 8:20 a.m. until approximately 11:40 a.m. when he followed the SERT team up to and into the Flood residence after the SERT team entry and after the execution of the ASW by the search team, he transported Flood to the State Police Barracks; he did not see Rabreau or Brubaker enter the area by vehicle, but he did observe Hamlin's vehicle enter the area approximately 8:30 a.m. and called the Barracks with this information. TVII, pp. 84-86, 88-89, 138.

Flood waived his Fifth and Sixth Amendment rights in writing and provided a statement. TVII, pp. 65-68, 81-82, 93, Government Exhibit 16.

On April 11, 2004, Flood did not exhibit signs of being under the influence of any drug, *i.e.*, glassy eyes, slurred speech, unsteady gait, and not maintaining eye contact when speaking with someone. TVII, p. 69.

Flood indicated that he rented the house in which the 500 pounds of marijuana was seized, that Rabreau had delivered it on the morning of April 11, 2004, and that it was to be sold to Flood for $675 a pound and in turn he would sell it to Brubaker for $775 a pound. TVII, pp. 69-72, 112, 278.

Flood also confirmed that Vance was not involved with the transaction for the 500 pounds of marijuana, but he had given Vance small amounts of marijuana in the past; Vance was only present to fix Flood's truck. TVII, p. 72.

Flood had been expecting the delivery of the 500 pounds of marijuana, but not on any specific date, *i.e.*, April 11, 2004. TVII, pp. 73, 297.

Flood was given a soda drink during his initial interview, and was offered food later in the day and given the chance to use the restroom some time after the initial interview; he was handcuffed to his chair only when Trooper Snyder left the room. TVII, pp. 73, 65, 107-109.

During Flood's initial interview, only Trooper Snyder was in the interview room, the interview lasted approximately an hour, and the Trooper did not yell at or raise his voice to Flood, did not touch Flood, and Flood did not appear to be ill and he communicated with the Trooper without difficulty. TVII, pp. 73-74.

Flood gave an oral, not a written statement; the oral statement was not audio-recorded for fear that Flood might not want to speak if he was being recorded. TVII, pp. 75, 83-84, 94-95, 103.

Trooper Snyder then left the interview, sought out Corporal Zimmerman or Trooper Schaefer for the purpose of having another person witness Flood's oral agreement with Trooper Snyder's notes from the initial interview, found Corporal Zimmerman and briefed him on what Flood stated, and Corporal Zimmerman returned to the interview room with Trooper Snyder. TVII, pp. 75, 104, 120.

During this second interview in the presence of Corporal Zimmerman, Flood was not re-mirandized, but Corporal Zimmerman asked if he was previously mirandized and if he still understood his rights. TVII, pp. 75-76, 104, 143.

32

In the presence of Corporal Zimmerman, Trooper Snyder reviewed his notes of the initial interview with Flood and Flood confirmed that they were correct. TVII, pp. 76, 97-98, 120-121.

Corporal Zimmerman then began his own questioning of Flood regarding Vance's involvement and Flood's debt in California, and Flood did not respond but indicated that he wanted to take a break from the questioning and questioning ended. TVII, pp. 76-78, 80, 82-83, 95-99, 102, 121-122.

Corporal Zimmerman then told Flood that when he wanted to tell Trooper Snyder the truth, that Trooper Snyder would speak to him again. TVII, pp. 78, 98-99, 123

Corporal Zimmerman was dressed in street clothes, did not raise his voice and did not touch Flood while questioning him in front of Trooper Snyder. TVII, pp. 121-122.

After another two to three hours, Trooper Snyder was told to re-interview Flood concerning a briefcase that was found at his residence; the Trooper did not re-mirandize him and questioned Flood without requesting his permission for about five minutes and Flood answered the questions indicating that he had no knowledge of the briefcase being in his residence prior to Brubaker and Hamlin appearing at his residence. TVII, pp. 78-80, 99-102.

Trooper Snyder also questioned Hamlin before and after questioning Flood regarding the suitcase; Hamlin was not re-mirandized, but reminded of his rights and he indicated that he understood his rights and would answer Trooper Snyder's questions. TVII, pp. 101-103.

Flood did not indicate that he wanted to obtain an attorney or speak to an attorney at any time while speaking to Trooper Snyder. TVII, pp. 80, 95, 102.

33

## TAPE RECORDINGS

Government Exhibits Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen are audible.

Government Exhibits Four and Five are slightly audible as to the comments of Brubaker, but inaudible as to the comments of the individual with whom he is speaking to.

Government Exhibit Three is audible as to the comments of Brubaker and inaudible as to certain responses being directed to Brubaker by other individuals, although the comments from another individual clearly are audible as made to Brubaker regarding the purchase of marijuana prior to Brubaker exiting the Flood residence.

## CONCLUSIONS OF LAW

A trial judge has "considerable discretion regarding the admissibility of a tape recording where there is a serious question of its audibility." *U.S. v. Jackson*, 649 F.2d 967, 977 (3d Cir. 1981) *citing U.S. v. Frazier*, 479 F.2d 983 (2d Cir. 1973).

Government Exhibits Three, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen are "trustworthy" and found to be admissible at trial as the "unintelligible portions are [not] so substantial as to render [these] recording[s] as a whole untrustworthy." *United States v. DiSalvo*, 34 F.3d 1204, 1220 (3d Cir. 1994).

Government Exhibits Four and Five are found to be untrustworthy because the comments of Brubaker are slightly audible, but the incriminating responses alleged to be within these recordings and made by Flood are inaudible and therefore, because the other participant in the conversation with Brubaker is unable to be heard, the Court finds that these recordings where only Brubaker's voice is

34

audible are untrustworthy in the sense of what they reflect and who is being incriminated in the conversation with Brubaker and furthermore, because of the inaudibility, these recordings are not probative of guilt of any of the Defendants and are incompetent evidence. *Id. See also U.S. v. Arango-Correa*, 851 F.2d 54, 58-59 (2d Cir. 1988).

Considering the totality of the circumstances, Brubaker has not been proven to be an unreliable source as alleged by Flood; his inexperience with being a confidential informant and the feigning of continuing his participation in the conspiracy at issue do not invalidate the information he provided to law enforcement, but gave him first hand knowledge of the alleged criminal acts and the information he provided regarding its participants and its previous failed attempts to secure marijuana were independently corroborated by law enforcement and through the audio surveillance provided through the willingness of Brubaker thus proving him a reliable confidential informant. See *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *U.S. v. Bronowski*, 575 F.Supp. 668 (W.D.Pa. 1983); Government Exhibit 15.

Anticipatory search warrants are permissible under the Fourth Amendment. *United States v. Grubbs*, ___ U.S. ___, 126 S.Ct. 1494, 1499-1500, ___ L.Ed.2d___, 2006 WL 693453 at *3-4 (2006)

The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

It was not necessary for the ASW to list the "triggering" events and the failure to list the

35

"triggering" events did not cause the ASW in the case *sub judice* to run afoul of the warrant requirements found in the Fourth Amendment. *United States v. Grubbs*, ___ U.S. ___, 126 S.Ct. 1494, 1501, ___ L.Ed.2d___, 2006 WL 693453 at *5-6 (2006).

All four "triggering" events, as set forth in the affidavit of probable cause filed in support of the ASW, occurred prior to the execution of the ASW.[5]

The Supreme Court has not addressed the necessity to present a search warrant prior to a search at the request of the owner or an occupant of the premises to be searched. *Groh v. Ramirez*, 540 U.S. 551, 561-562, 124 S.Ct. 1284, 1292, 157 L.Ed.2d 1068, n. 5 (2004).

However, the Supreme Court has recognized that the Fourth Amendment does not require service of the search warrant before a search of the subject premises; indeed the language of the Fourth Amendment indicates no such requirement. *Id.* U.S. Const. amend. IV. *See also Walter v. U.S.*, 447 U.S. 649, 657, 100 S.Ct. 2395, 2402, 65 L.Ed.2d 410, 418 n. 10 (1980) (recognizing that the execution of a search warrant is not "unlawful" if it is not presented to the owner of the premises to be searched)(per Justice Stevens, with one Justice joining, two Justices concurring in part and concurring in judgment and one Justice concurring in judgment)(dictum).

The Federal Rules of Criminal Procedure apply only to federal prosecutions and not to any actions taken by law enforcement in furtherance of a search of a premises or a person on behalf of a state's investigation of violations of state criminal law; thus Federal Rule of Criminal Procedure 41 did not apply to the search of the Flood residence and the obtaining and executing of the search warrant on

---

[5]Vance concedes that the triggering event of the telephone call by Brubaker made inside of the Flood residence to Trooper Schaefer did occur. Vance's Proposed Findings of Fact, p. 2, n. 1.

the Flood residence. *See U.S. ex rel. Gaugler v. Brierley*, 477 F.2d 516, 523 (3d Cir. 1973).

No issues regarding the suppression of evidence or statements based upon 18 U.S.C. § 3501 or Federal Rule of Criminal Procedure 5 are actionable in this proceeding as all actions complained of were taken by actors within Pennsylvania's criminal justice system, and not by federal actors in furtherance of a federal prosecution. *U.S. v. Alvarez-Sanchez*, 511 U.S. 350, 357-360, 114 S.Ct. 1599, 1603-1605, 128 L.Ed.2d 319, 327-329 (1994).

No working arrangement existed between federal and Pennsylvania law enforcement authorities in this matter; therefore, Federal Rule of Criminal Procedure 5(a) does not apply to the actions of the Pennsylvania State Police Officers in the case *sub judice* based upon such a theory.[6]

The Government is not required to comply with Federal Rule of Criminal Procedure 5 when a defendant was not initially taken into custody by federal law enforcement agents and not taken to a magistrate judge for arraignment; a defendant bears the burden of demonstrating that a "working arrangement" exists between local law enforcement authorities and federal law enforcement authorities to circumvent and thereby violate Federal Rule of Criminal Procedure 5 by delaying arraignment, *see U.S. v. Mayes,* 552 F.2d 729 (6th Cir. 1977), and that burden was not met here.

The warrant was facially valid as the warrant with its attachments listed the items to be seized and places and people to be searched and that warrant, its attachments and a written inventory of seventy three items seized were left on the kitchen counter of the Flood residence at the completion of the search. *Groh v. Ramirez,* 540 U.S. 551, 557-558, 124 S.Ct. 1284, 1289-1290, 157 L.Ed.2d 1068,

---

[6]18 U.S.C. § 3501 is also inapplicable under this theory because of this conclusion as well as the fact that this statute has been found to be an unconstitutional attempt to overrule *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)*. See Dickerson v. U.S.*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

1078-1079 (2004); *Bartholomew v. Commw. of Pa.*, 221 F.3d 425, 429-430 (3d Cir. 2000); Government Exhibit 15.

The Defendants have the burden of establishing that they possess "standing" under the Fourth Amendment in order to challenge the validity of the search warrant. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998).

Flood clearly had a "legitimate expectation of privacy" in his residence which was the subject of the ASW. U.S. Const. amend. IV; *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967).

Vance was an "overnight" guest for the night of April 10, 2004 into the morning of April 11, 2004 and the facts supporting this status are: 1) Vance had stopped at Flood's residence for the purpose of inspecting a problem with Flood's truck and possibly fixing it while intending to travel on to Akron Ohio to visit his daughter for Easter Sunday, April 11, 2004; 2) Vance was given a key to the Flood residence on the afternoon of April 10, 2004 by Flood; 3) as the day of April 10, 2004 grew late, Flood invited Vance and his "stepdaughter" to stay the night rather than travel on; and 4) Vance had previously stayed overnight at the Flood residence.

Based upon his status as an overnight guest, a status attendant with an "expectation of privacy...rooted in 'understandings that are recognized and permitted by society'" Vance was entitled to a legitimate expectation of privacy while within the Flood residence and thus may challenge the validity of the ASW at issue in the case *sub judice*. *Minnesota v. Olson*, 495 U.S. 91, 98-100, 110 S.Ct. 1684, 1689-1690, 109 L.Ed.2d 85, 94-95 (1990) *citing Rakas v. Illinois*, 439 U.S. at 144, 99 S.Ct. 421, 431, 58 L.Ed.2d 387, 401-302 n. 12(1987).

Rabreau was present at Flood's residence for the purpose of delivering the marijuana seized under the ASW and had arrived early in the morning of April 11, 2004 with a traveling companion and both were sleeping at the time of the execution of the ASW; although Rabreau had previously been a welcomed guest at Flood's residence it is unknown whether he was an overnight guest in the past, the fact that Rabreau was welcomed at the Flood residence and was sleeping in that residence on the morning of April 11, 2004 does not entitle him to an overnight guest's legitimate expectation of privacy within Flood's residence as the sole purpose for his presence therein was the delivery of marijuana in exchange for a payment of U.S.currency. *Minnesota v. Carter*, 525 U.S. 83, 90-91, 119 S.Ct. 469, 474, 142 L.Ed.2d 373, 380-381 (1998); *U.S. v. Perez*, 280 F.3d 318, 337 (3d Cir. 2002).

Therefore, Rabreau was without a legitimate expectation of privacy within the Flood residence at the time of the execution of the ASW and his Motion to Suppress Evidence is denied for lack of a legitimate expectation of privacy within the Flood residence.

In approving ASWs, judicial officers must find that the ASW complies with the Fourth Amendment just as any other warrant that does not rely upon triggering events, however, ASWs comply with the Fourth Amendment when they are found: 1) to be based upon probable cause that "'contraband or evidence of a crime will be found in a particular place,'" and 2) that probable cause exists "to believe the triggering condition *will occur*." *Grubbs, supra*___ U.S.___, 126 S.Ct. 1494, 1500, ___ L.Ed.2d ___ 2006 WL 693453 at *4 (2006)(emphasis in original)(internal citation omitted).

In reviewing a challenge to the finding of probable cause by the judicial officer who issued a warrant, this Court is guided by a review of the totality of the circumstances to determine if a substantial basis exists to find that probable cause existed and may not embark on a *de novo* review of the probable

39

cause determination. *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983); *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993).

This type of review should not be a "rubber stamp" of the magistrate's finding, but "'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993)(citations omitted).

"The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) quoting *Illinois v. Gates*, 462 U.S. 213, 230-231, 103 S.Ct. 2317, 2328, 76 L.Ed. 527, 543-544 (1983).

The Court finds after a review of the totality of the circumstances that a substantial basis exists for the judge's finding of probable cause that: 1) the marijuana was going to be at the Flood residence at the time of the search, *i.e.*, after the occurrence of all four triggering events; and 2) probable cause was established in the affidavit that demonstrated that all four triggering events set forth in the affidavit would occur because the affiant, Trooper Schaefer, a) described in detail the practices of the drug trade, including movement of illicit profits and the uncertainty of delivery of controlled substances and the usage of cellular phones, b) he described the information provided by Brubaker concerning the Defendants and that such information was confirmed as correct, c) he described Brubaker's place in the Defendants' organization which had the objective to distribute illegal substances, specifically marijuana and d) he described the ongoing difficulties of Flood in attempting to locate and obtain a shipment of marijuana to his residence consistent with his knowledge and experience previously set forth regarding the illicit controlled substances trade.

Furthermore, the triggering events listed in the affidavit of probable cause all occurred prior to the execution of the ASW and the first triggering event, the arrival of the marijuana, occurred prior to Judge Doyle signing the ASW.

Because the search of Flood's residence was a legal search, the statements of Vance and Flood cannot be excluded under the "fruit of the poisonous tree" doctrine. *See Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 2260-2261, 45 L.Ed.2d 416, 425-426 (1975).

To be valid, a waiver of Fifth Amendment rights under *Miranda* must be knowing, intelligent and voluntary. *See Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980)(discussing knowing and intelligent waiver); *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

If a defendant invokes the right to remain silent, "the interrogation must cease"; interrogation may resume if the defendant's right to remain silent was "scrupulously honored." *Miranda v. Arizona*, 384 U.S. 436, 473-474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723-724 (1966); *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975).

To determine if a defendant has invoked his right to remain silent, various courts of appeals have applied the objective unambiguous request standard in *Davis v. U.S.*, 512 U.S. 452, 458-459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371-372 (1994), which requires an unambiguous and unequivocal request for an attorney to invoke the right to counsel, to situations regarding invocations of the right to remain silent. *See e.g., Medina v. Singletary*, 59 F.3d 1095, 1100-1101, (11th Cir. 1995); *Simmons v.*

*Bowersox*, 235 F.3d 1124, 1131 (8ᵗʰ Cir. 2001).[7]

Flood's indication that he wished to take a break from questioning was not an unequivocal and unambiguous invocation of his right to remain silent; nonetheless, the police honored Flood's request to take a break from questioning.

Vance was mirandized prior to his initial interview with Trooper McEldowney and Vance knowingly, intelligently and voluntarily waived his rights and provided an oral statement; the evidence of record does not demonstrate that Vance refused to give a statement, but only that he refused to give a written statement.

A defendant's refusal to give a written statement, but his decision to give an oral statement instead does not demonstrate an improper waiver of his right to remain silent as there may have been "strategic reasons" for Vance's decision, *Connecticut v. Barret*, 479 U.S. 523, 530, 107 S.Ct. 828, 832-833, 93 L.Ed. 2d 920, 929 n. 4(1987)(citations omitted); the Supreme Court has "never 'embraced a theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barret*, 479 U.S. 523, 530, 107 S.Ct. 828, 832-833, 93 L.Ed.2d 920, 929 (1987)(citations omitted).

Furthermore, there is no evidence of record that demonstrates that Vance misunderstood the waiver of his Fifth Amendment rights by the fact that he did not want to provide a written statement, but only an oral statement.

Vance was never promised the return of his "stepdaughter" to his girlfriend by CYS if he made

---

[7]The Court of Appeals for the Third Circuit has yet to address the application of this standard to unequivocal invocations of the right to remain silent.

an incriminating statement or otherwise waived his *Miranda* rights.

There is no evidence that Flood misunderstood his *Miranda* warnings and the rights explained therein and his decision to give only an oral statement that was not audio-recorded or to give a written statement alone does not demonstrate an improper waiver of his right to remain silent, as similar to Vance, Flood may have had "strategic reasons" for not providing a written or audio record of his statement.

No violation of the rights of Vance and Flood occurred with respect to a prompt judicial determination of probable cause.

It has been recognized that in order to satisfy the probable cause requirements of the Fourth Amendment, the arraignment of an individual arrested, without an arrest warrant, should generally take place within forty-eight hours of the arrest, but that an unreasonable delay in arraignment may still occur prior to the expiration of the forty-eight hour period; however, the burden is on the defendant prior to the expiration of forty-eight hours to demonstrate that the delay was unreasonable, and after forty-eight hours the burden shifts to the Government to demonstrate that the delay was the result of a "bona fide emergency or other extraordinary circumstance." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49, 63 (1991).

In explaining "unreasonable" delay, the Supreme Court in *McLaughlin* recognized the following:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable dealy are delays for the purpose of gathering additional evidence to

43

justify arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*Id.* 500 U.S. 44, 56-57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49, 63 (1991).

The arrests of Flood and Vance were based on the valid search of Flood's residence and the discovery of controlled substances and a weapon within the residence, where Flood resided and Vance had spent the night; the arrests were not based upon previously issued arrest warrants.

Flood and Vance were entitled to a probable cause determination before a detached and neutral magistrate after their arrest. *Gerstein v. Pugh*, 420 U.S. 103, 112-113, 114, 95 S.Ct. 854, 862, 863, 43 L.Ed.2d 54, 64 (1975).

It is clear that Vance was not going to be arraigned prior to the Pennsylvania State Police taking appropriate steps to ensure the safety of his "stepdaughter" because of their belief that Vance would be detained and not awarded any type of pretrial release; this delay was reasonable in light of the fact that the state police wanted to ensure the "stepdaughter's" protection and continued care.

After the removal of Vance's "stepdaughter" from the state police barracks, Vance indicated his willingness to speak to the police which prolonged his presentation to the state district justice until the time he completed his statements to the police; this was reasonable delay as well because Vance initiated this contact with Trooper McEldowney, who contacted Trooper Schaefer, and after Trooper Schaefer's discussion ended, Vance again initiated contact and made statements to Trooper McEldowney.

Among the other considerations for the time elapsing between arrest and arraignment of Vance and Flood is the fact that seventy three items were catalogued in the search of the Flood residence and needed to be evaluated for purposes of developing the criminal charge to be filed against those arrested as well as the processing of six suspects who were arrested pursuant to the search; such processing of suspects and evaluating evidence to determine if and what charges were going to be filed is the basis for further reasonable delay.

The delay that is attributable to the custodial interrogation of Vance and Flood and the statements they made to police was reasonable delay as they voluntarily spoke to law enforcement.

Prior to making statements to the police officers interviewing them, the Pennsylvania State Police possessed sufficient evidence to establish probable cause to arrest Vance and Flood and such statements were not taken for the purpose of justifying the arrest of Vance and Flood.

Furthermore, the time between the arrest of Vance and Flood and their arraignment (approximately ten hours) was not a delay made for ill will or for the sake of delay, but was a delay that encompassed not only the cataloguing of the fruits of the search of the Flood residence, but the booking of all suspects, the interrogation of the suspects willing to speak, the contacting of CYS to ensure the safety of Vance's "stepdaughter" and the completion of the interrogations of Vance and Flood prior to removing all suspects to the Pennsylvania district justice on duty that Easter Sunday in order to arraign all of the suspects.

After considering all of these legal conclusions based upon the findings of fact by this Court, the Court concludes that the delay of approximately ten hours from arrest to arraignment of Flood and Vance was reasonable delay under the circumstances.

45

**AND NOW**, this 28th day of April 2006, this matter coming before the Court on the various motions of the Defendants, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT:

1)  Wayne Vance's Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 72) is GRANTED and the Court defers ruling on the admission of such evidence until the time of trial in this matter;

2)  Raymond Rabreau's Motion *in Limine* with Citation of Authority (Document No. 59) is GRANTED and the convictions of the Defendant dated 1971, 1978, 1982, and 1988 are ordered excluded from evidence at the time of trial;

3)  Ruling upon Raymond Rabreau's Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 60) is deferred to the time of trial as to the proposed Rule 404(b) evidence so that the Court may consider such evidence in context and the Motion is GRANTED IN PART as to the introduction of the 1988 conviction and DENIED IN PART as to the introduction of the 2002 conviction and such conviction may be admitted for impeachment purposes should the Defendant testify at trial;

4)  Raymond Rabreau's Motion to Change Counsel/Motion for Reconsideration Based on New Facts and Issues (Document No. 120) is DENIED;

5)  Kevin Flood's Motion to Quash Indictment (Document No. 71) is DENIED;

46

6)   Kevin Flood's Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 87) is CONDITIONALLY DENIED as to using the Defendant's convictions from 1992 as Rule 609 evidence, but said convictions may be introduced should the Defendant deny knowledge of the workings of the "drug trade", deny that he has been arrested previously or deny being convicted previously of a drug-related criminal offense and ruling is deferred as to the evidence sought by the Government to be introduced at trial under F.R.E. 404(b) until the time of trial so that the Court may consider such evidence in context and allow the Defendants to respond to the Government's evidence that it argues is intrinsic to the crime charged;

7)   Kevin Flood's Motion to Suppress and Motion to Suppress Statement (Document No. 71) are DENIED and Kevin Flood's Motion to Suppress Audio-Taped Surveillance (Document No. 71) is GRANTED IN PART and DENIED IN PART and Government's Exhibits Four and Five (Taped audio recordings dated 3/7/2004 and 3/10/2004) are deemed inadmissible for purposes of trial and Government's Exhibits Three, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen and Fourteen (Taped audio recordings dated 3/5/2004, 3/15/2004, 3/18/2004, 3/22/2004, 4/2/2004, 4/5/2004 (two recordings) and 4/9/2004 (three recordings)) are deemed admissible for purposes of trial;

8)   Wayne Vance's Motion to Suppress (Document No. 73) is DENIED; and

9)   Wayne Vance's Supplemental Motion to Suppress Evidence and Defendant's Statement's (Document No. 123) is DENIED.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

48